**SOUTHWEST CENTER FOR BIOLOGICAL DIVERSITY; California Native Plant Society; Save Our Forests and Ranchlands; Carmel Mountain Conservancy, Preserve Wild Santee; Iron Mountain Conservancy; Ramonans For Sensible Growth; San Diego Audubon Society; Sierra Club; Horned Lizard Conservation Society; Earth Media; Preserve South Bay; San Diego Herpetological Society; Wetlands Action Network, Plaintiffs–Appellees,**

**v.**

**Ken BERG, Carlsbad Field Supervisor; Anne Badgley, Acting Regional Director; Gale Norton,\* Secretary of the Interior; Michael Uberuaga, San Diego City Manager, Defendants–Appellees,**

**Pardee Construction Company; Building Industry Legal Defense Foundation; National Association of Home Builders; California Building Industry Association; Building Industry Association of San Diego, Applicants in intervention-Appellants.**

No. 99–56627.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 2001

Filed Sept. 27, 2001

---

\* Gale Norton is substituted for her predecessor, Bruce Babbitt, as Secretary of the Interior pursuant to Fed. R.App. P. 43(c)(2).

John C. Eastman (argued), the Clare-
mont Institute Center for Constitutional

Jurisprudence, Claremont, California, and Hugh Hewitt and William E. Halle, Hewitt & McGuire, LLP, Irvine, California, for applicants in intervention-appellants.

Neil Levine (argued), Earthlaw, Denver, Colorado, Daniel J. Rohlf, Pacific Environmental Advocacy Center, Portland, Oregon, and Marco Gonzales, Solano Beach, California, for plaintiffs-appellees.

Before: RYMER, HAWKINS, and GOULD, Circuit Judges.

GOULD, Circuit Judge:

■ We must decide the proper scope of intervention as of right pursuant to Federal Rule of Civil Procedure 24 ("Rule 24") in the context of environmental litigation. Pardee Construction Company ("Pardee") and four national and local building trade associations (the "Builders") (collectively, "Applicants") appeal the denial of their motion to intervene in an action for declaratory and injunctive relief brought by the Southwest Center for Biological Diversity and other environmental groups (collectively, "Southwest") against various officers of the U.S. Fish and Wildlife Service ("FWS"), the Department of the Interior, and the City of San Diego (the "City"), and the U.S. Army Corps of Engineers (collectively, "Defendants"). Southwest challenges the measures Defendants have taken to ensure the protection of seven endangered wetland species, and the validity of conservation plans and an agreement and permit that regulate development projects affecting these and other protected species. We have jurisdiction over the denial of a motion to intervene as of right as a final appealable order pursuant to 28 U.S.C. § 1291. *Donnelly v.*

*Glickman,* 159 F.3d 405, 409 (9th Cir. 1998). We reverse the denial of the motion to intervene and remand.

## FACTS AND PROCEDURAL HISTORY

Section 9 of the Endangered Species Act ("ESA") makes it unlawful for any person to "take" an endangered species of fish or wildlife. 16 U.S.C. § 1538(a)(1)(B). FWS has extended the take prohibition to include threatened fish and wildlife. 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31(a). The "take" of a protected species includes "harm," 16 U.S.C. § 1532(19), which, in turn, includes effects from any "significant habitat modification or degradation where it actually kills or injures wildlife." 50 C.F.R. § 17.3.

Section 10 of the ESA creates an exemption from the ESA's prohibition on the take of covered species. It grants FWS the power to issue permits allowing for the take of listed species that incidently results from lawful activities on private property. 16 U.S.C. § 1539(a)(1)(B). To obtain an "Incidental Take Permit" ("ITP"), a party must develop a "habitat conservation plan" ("HCP") that provides for ongoing mitigation efforts to minimize the project's future impact on protected species. 16 U.S.C. § 1539(a)(2); 50 C.F.R. § 17.22. Before issuing an ITP, FWS must prepare and evaluate a biological opinion to ensure that the project will not jeopardize the continued existence of covered species. 16 U.S.C. §§ 1536(a)(2), (b)(3)(A).

■ In 1991, California passed the Natural Communities Conservation Planning Act ("NCCPA"). 1991 Cal. Stat. 765 (codified at CAL. FISH & GAME CODE §§ 2800–2840). The purpose of the NCCPA is to encourage planning among affected interests for habitat protection of species to avert their listing under the

ESA. The NCCPA authorizes the California Department of Fish & Game ("CDFG") to enter agreements with parties to implement a Natural Communities Conservation Plan ("NCCP") "to provide comprehensive management and conservation of multiple wildlife species." CAL. FISH & GAME CODE § 2810.[1]

In 1990, the City began developing a comprehensive land management plan known as the San Diego Multi–Species Conservation Program ("MSCP") Plan. The MSCP Plan encompasses a 900–square–mile area in San Diego County (the "County"), including the City, portions of the County's unincorporated areas, and some coastal and inland cities within the County. The MSCP Plan became a blueprint for a "workable balance between preservation of natural resources and regional growth and economic prosperity."

The MSCP Plan took more than five years to develop and involved participation and negotiation by stakeholders including federal, state, and local governments; wildlife agencies; property owners; environmental groups; and citizens. The twenty-nine member MSCP Working Group represented stakeholders including plaintiff the Sierra Club, defendants the City and FWS, and Applicants Pardee and the Building Association of San Diego ("BIA/SD").

The MSCP Plan established a permanent 171,917 acre preserve called the Multi–Habitat Planning Area (the "MHPA"), which covers about thirty percent of the County's total land area. Private landowners contributed about thirty-seven percent of the MHPA acreage. Under the MSCP Plan, the City and other municipalities within the plan's area are responsible for developing their own "subarea plans." The City's Subarea Plan ("Subarea Plan") encompasses 200,000 acres—approximately thirty-five percent of the total MSCP Plan area.

After development of the MSCP Plan and the Subarea Plan (collectively, the "Plans"), FWS, CDFG, and the City entered into a contractually binding Implementation Agreement ("IA"). The Plans qualify as both an HCP and a NCCP, and they are specifically incorporated into the IA. Pursuant to the IA and shortly after its execution, FWS issued the City an ITP ("City's ITP") covering eighty-two protected species and incorporating the Plans and the IA. The City's ITP gives the City power for fifty years to confer delegated incidental take authority on projects that comply with all requirements of the IA, the City's ITP, and the Plans.

The IA also grants the City the power to create third-party beneficiaries to the IA, if they meet additional regulatory requirements outlined in the IA and the Plans. Under paragraph 17.1(A) of the IA, the

---

1. The NCCPA includes a statement of legislative findings, declaring in part:

(c) Natural community conservation planning is an effective tool in protecting California's natural diversity while reducing conflicts between protection of the state's wildlife heritage and reasonable use of natural resources for economic development. (d) Natural community conservation planning promotes coordination and cooperation among public agencies, landowners, and other private interests, provides a mechanism by which landowners and de-

velopment proponents can effectively participate in the resource conservation planning process, provides a regional planning focus which can effectively address cumulative impact concerns, minimizes wildlife habitat fragmentation, promotes multispecies management and conservation, provides an option for identifying and ensuring appropriate mitigation for impacts on fish and wildlife, and promotes the conservation of broad based natural communities and species diversity.

CAL FISH & GAME CODE § 2801.

City confers Third Party Beneficiary status on projects pursuant to its review of the project's impacts on biological resources, determination of necessary mitigation measures to compensate for such impacts, and imposition of such mitigation as a condition of development binding on those with Third Party Beneficiary status. The IA allows the City to confer its delegated incidental take authority on Third Party Beneficiaries. The IA also provides "assurances" that, absent "extraordinary circumstances" or future listing of species as protected, the City will not impose on Third Party Beneficiaries additional mitigation or protective measures other than those allowed by the IA.

Although the broadest of the IA's assurances are given to Third Party Beneficiaries, the IA also protects against further mitigation and conservation regulation to projects identified as in the "Approval Process." Projects in the Approval Process are given a "Category" ranking from 1 to 3, with projects in the last category considered the furthest along in the approval process. According to the IA, proponents of projects in Category 3 are considered "vested under California law."

Vernal pools are freshwater wetlands that form in shallow depressions on mesa tops and valley floors. The depressions fill with rainwater and runoff in the Fall and Winter, and dry up in the Spring. Vernal pools are a shrinking environment in California, with an estimated ninety-seven percent of such habitats already destroyed by development. Five plant and two shrimp species that inhabit San Diego's vernal pools are endangered. The City's ITP lists these species among its covered species.

On December 30, 1998, Southwest and thirty local and national environmental groups filed a First Amended Complaint in district court asserting fourteen claims for relief against Defendants. The action alleges Defendants did not abide by ESA requirements in protecting seven vernal pool species. Southwest challenges the formulation, approval, and implementation of the IA, the Plans, and the City's ITP.

Southwest's claims for relief include claims: (1) that challenge the adoption of the City's HCP (MSCP Plan, identified in the First Amended Complaint as including the Subarea Plan and IA) and the issuance of City's ITP for failing to comply with the procedural requirements of the ESA; (2) that assert the Subarea Plan and City's ITP are illegal based on failures to satisfy substantive standards of the ESA for the vernal pool species; (3) that FWS should have revoked the City's ITP for the failure to abide provisions implementing monitoring, management, and regulatory protocols specified in the Subarea Plan and IA as incorporated by the ITP and failure of the FWS to abide other ESA requirements; (4) that FWS failed to complete a Recovery Plan for vernal pool species under Section 4(f) of the ESA; and (5) that the Cousins MarketCenter project offends the ESA, the Clean Water Act ("CWA"), and the National Environmental Policy Act ("NEPA").

In its prayer for relief, Southwest requests the district court, *inter alia*, (1) to declare the City's HCP insufficient under the ESA; (2) to declare unlawful FWS's biological opinion ("Biological Opinion") concerning the seven vernal species conducted before the issuance of the City's ITP; (3) to declare unlawful the procedures by which the City applied for its ITP; (4) to declare that the City violated its ITP; (5) to declare null and void and revoke the Biological Opinion and the City's ITP; (6) to order FWS to require mitigation for projects authorized pursuant to the City's ITP; and (7) to order injunctive relief against the Cousins MarketCen-

ter ("Cousins") and Torrey Surf Development ("Torrey Surf") projects to abate activities that destroy vernal pools.

On June 4, 1999, Pardee and the Builders (BIA/SD, Building Industry Legal Defense Foundation ("BILDF"), National Association of Home Builders ("NAHB"), and California Building Industry Association ("CBIA")) moved for leave to intervene as of right or for permissive intervention on behalf of Defendants. With the motion, Applicants filed a "[Proposed] Answer of Applicants for Intervention ... to First Amended Complaint," as required by Rule 24(c), along with a supporting memorandum and attached declarations, and later a reply memorandum. Southwest opposed the motion on grounds that Applicants did not meet the requirements for intervention as of right under Rule 24(a) or permissive intervention under Rule 24(b). The City filed a memorandum in which it took "no position," on the motion for intervention, but stated that while the City and Applicants shared the same interest in preserving the "MSCP and ITP, the City does not purport to represent the interests of the development community." So far as we can determine from the record, no other defendant filed any memorandum expressly taking a position on intervention.

On August 17, 1999, Southwest filed a Second Amended Complaint deleting the claims related to the Cousins MarketCenter project and later a Third Amended Complaint was filed. On August 25, 1999, the district court issued an order denying Applicants' motion to intervene as of right and denying permissive intervention. Applicants filed a motion for reconsideration under Federal Rule of Civil Procedure 60(b)(2) with declarations adding documentation of Applicants' alleged status as third-party beneficiaries and other facts pertinent to intervention. The district court denied Applicants' motion for reconsideration.

Applicants filed a timely appeal of the district court's denial of both the motion to intervene and the motion for reconsideration.

## DISCUSSION

■ Rule 24 provides for intervention as of right and permissive intervention. Applicants sought leave to intervene on both grounds. We review de novo a district court's denial of a motion to intervene as of right, with the exception of timeliness, which we review for abuse of discretion. *Donnelly,* 159 F.3d at 409.

■ Where, as here, no federal statute confers an unconditional right to intervene, Rule 24(a) provides for intervention as of right:

Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

FED. R. CIV. P. 24(a).

■ We apply a four-part test under Rule 24(a): (1) the application for intervention must be timely; (2) the applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit. *Northwest Forest Resource*

Council ("NFRC") v. Glickman, 82 F.3d 825, 836 (9th Cir.1996).

■■■ In general, we construe Rule 24(a) liberally in favor of potential intervenors. *Forest Conservation Council ("FCC") v. United States Forest Serv.*, 66 F.3d 1489, 1493 (9th Cir.1995). In addition to mandating broad construction, our review is "guided primarily by practical considerations," not technical distinctions. *United States v. Stringfellow*, 783 F.2d 821, 826 (9th Cir.1986), *vacated on other grounds sub nom. Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987). *See also Donnelly*, 159 F.3d at 409 (reviewing "practical and equitable considerations" bearing on intervention).

## I. Timeliness

As the parties agree that Applicants' motion to intervene was timely, we need not address this factor.

## II. Proposed Intervenors's Interests

■■ Applicants asserted in the district court and argue here five legally protectable interests in this action: (1) they are "present and/or certain future intended third-party beneficiaries of the incidental take authority granted pursuant to the City's IA," (2) they "are relying and intend regularly in the future to rely on [incidental take] authority and assurances," (3) they have an interest in their property and the regulatory burden of their present and future projects governed by the Subarea Plan over the next fifty years, (4) they have an interest in "how several significant issues raised by [Southwest's] claims are resolved" and in the potential for "an adverse precedential effect," and (5) they have an interest in the Plans placed in jeopardy by the action given the "truly prodigious amount of resources Applicants have invested in their development and adoption." Because we conclude that Applicants have legally protectable interests based on their ownership of on-going projects that are on the approved negotiated project list for assurances and approval pursuant to the IA, we do not reach their remaining assertions.

Applicants argue that they have a legally protectable interest because they are present third-party beneficiaries of the IA and presently rely on the City's ITP. In rejecting this interest, the district court concluded that Applicants failed to demonstrate (1) that they are present third-party beneficiaries of either the IA or the City's ITP; (2) that they have received contracts, project approval, or permits pursuant to either the IA or the City's ITP; (3) that Applicants' projects relate to the vernal pools; or (4) that such projects will be affected by any relief sought in the action.

■■■ We have held that "[w]hether an applicant for intervention demonstrates sufficient interest in an action is a practical, threshold inquiry. No specific legal or equitable interest need be established." *Greene v. United States*, 996 F.2d 973, 976 (9th Cir.1993) (citing *Portland Audubon Soc'y v. Hodel*, 866 F.2d 302, 308 (9th Cir.1989)). "It is generally enough that the interest [asserted] is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue." *Sierra Club v. United States EPA*, 995 F.2d 1478, 1484 (9th Cir.1993).

■■■ An applicant demonstrates a "significantly protectable interest" when "the injunctive relief sought by the plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests." *FCC*, 66 F.3d at 1494. In *Sierra Club*, we held that the City of Phoenix was entitled to intervene as of right in an action brought by the Sierra Club

against the EPA under the CWA. The Sierra Club sought to have the EPA promulgate water quality standards for final pollutant discharge permits "that reduce toxics being discharged from each of the Arizona point sources." *Sierra Club,* 995 F.2d at 1480. "In practical terms, the Sierra Club wanted the court to order the EPA to change the [City's water discharge] permits." *Id.* at 1481. We held that the City could intervene as of right because the City's status as an EPA permittee could be affected when the relief sought would require the EPA to make the City's permits more restrictive. *Id.* at 1482, 1486. We stressed that "the lawsuit would affect the use of real property owned by the intervenor by requiring the defendant to change the terms of permits it issues to the would-be intervenor, which permits regulate the use of that real property. These interests are squarely in the class of interests traditionally protected by law." *Id.* at 1483.

In *Sierra Club,* we distinguished *Portland Audubon,* where we had held that timber industry representatives did not have a significant protectable interest to warrant intervention in the Audubon Society's action that sought to compel a federal agency to prepare an environmental impact statement and to enjoin all timber sales pending its preparation. *Portland Audubon,* 866 F.2d at 304, 309. *Sierra Club* reasoned that the loggers in *Portland Audubon* lacked a legally protectable interest because they did not have any existing legal right, contract or permits relating to the future timber sales that the Audubon Society sought to enjoin. *Sierra Club,* 995 F.2d at 1482. Their economic interest was "based upon a bare expectation," and therefore not cognizable for intervention. *Id.* In contrast, in *Sierra Club,* the City had already acquired enforceable water discharge permits from the EPA under the CWA. *Id.*

Applicants first assert that in finding they had no interest, the district court erred by not accepting the allegations and evidence submitted in support of their motion to intervene. We agree. Although we have never so held, other circuits have held that a district court is required to accept as true the non-conclusory allegations made in support of an intervention motion. *See, e.g., Reich v. ABC/York–Estes Corp.,* 64 F.3d 316, 321 (7th Cir.1995) (concluding that a court "must accept as true the non-conclusory allegations of [a] motion [to intervene]"); *Chesapeake Bay Found. v. Am. Recovery Co.,* 769 F.2d 207, 209 n. * (4th Cir.1985) (reviewing a statutory right to intervention and concluding, "[s]ince plaintiffs' complaint and motion to intervene were dismissed at preliminary stages without evidentiary testing, we must accept plaintiffs' allegations as true"); *Foster v. Gueory,* 655 F.2d 1319, 1324 (D.C.Cir.1981) (stating that "motions to intervene are usually evaluated on the basis of well pleaded matters in the motion, the complaint, and any responses of opponents to intervention"); *Mendenhall v. M/V Toyota Maru No. 11,* 551 F.2d 55, 56 n. 2 (5th Cir.1977); *Stadin v. Union Elec. Co.,* 309 F.2d 912, 917 (8th Cir.1962) (concluding that all well-pleaded nonconclusory allegations must be taken as true, and that a court may take notice of uncontroverted facts in pleadings and affidavits opposing intervention). This standard has also been endorsed by a leading civil procedure treatise. *See* 7C Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, § 1914 ("The pleading is construed liberally in favor of the pleader and the court will accept as true the well-pleaded allegations in the pleading.") (footnotes omitted).

We adopt this standard now. This rule requiring acceptance of the proposed inter-

venor's well-pleaded allegations makes particular sense where, as in this case, the propriety of intervention must be determined before discovery. We join the unanimous precedent of our sister circuits that have considered the issue.

 Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections. District courts may often be able to determine whether a prima facie case is made out by reference to the proposed intervenor's papers alone; however, we do not foreclose consideration of the pleadings and affidavits of opponents to intervention, nor do we preclude district courts from holding a hearing when necessary to resolve ambiguities or conflicts. *See* 7C· Wright, Miller, & Kane, *supra*, § 1914 (2d ed. 1986) ("Ordinarily there will be a hearing on the motion, at least if there is objection to the intervention from any party, but a hearing is not required if it is clear from the face of the application that the motion must be denied.").

Applying this standard here, we conclude that Applicants' motion for intervention should be granted. With their motion for leave to intervene, Applicants submitted a proposed answer, the administrative record, and a number of declarations by Builders and Leonard Frank, Senior Vice President of Pardee. Frank's declaration states that five ongoing Pardee projects, California Terraces ("Terraces"), Otay Corporate Center North & South ("Otay"), Dennery Ranch, and Carmel Valley, were included in the approved negotiated project list, and that with respect to each of these projects, Pardee is a third-party beneficiary of the IA. We understand that in so characterizing its position, Pardee is claiming at a minimum that it is a benefi-

ciary of IA's approval process as a result of being on the negotiated project list—not necessarily that it has already attained "Third Party Beneficiary status" under paragraph 17.1(A) of the IA. For our purposes, this distinction is not critical because Pardee's interests in projects that have been granted assurances under the IA and that are involved in various stages of planning and implementation are sufficient to constitute legally protectable interests.

Under the rule we adopt, we accept Pardee's well-supported declaration that these five projects were on the approved negotiated project list. Further, the IA indicates that each project has attained at least some level of assurance that its design or mitigation related to the covered species conforms to the MSCP Plan and the Subarea Plan.

 We conclude that the Pardee projects create sufficient legally protectable interests to support intervention as of right. Pardee has made a prima facie showing that he has a substantial interest as a third-party beneficiary of the assurances and approval process set out in the IA that could be affected if the IA were invalidated. Contract rights are traditionally protectable interests. *Sierra Club*, 995 F.2d at 1482; *cf. Hook v. State of Arizona*, 972 F.2d 1012, 1015 (9th Cir. 1992) (holding that intended third-party beneficiaries of an agreement have rights to enforce the contract that grants them beneficiary status). The connection between this interest and the claims in the action is sufficiently clear because the IA is threatened.

In finding legally protected interests, we also disagree with the district court's conclusion that Applicants cannot have legally protectable interests here in projects that do not involve the vernal pool species. As we have explained, the district court was

obligated at this stage to accept Pardee's declaration that some of its projects affected these species. Moreover, Southwest's challenge to the City's ITP, IA, and the Plans potentially affect those projects authorized pursuant to the City's ITP and the IA even where these projects involve covered species other than the vernal pool species.

There is no doubt that a central goal of this action is the protection of the vernal pool species. Nonetheless, the relief sought includes a declaration that the HCP planning process was illegal and that the City's ITP, which specifically incorporates the Plans and IA, should be revoked and the IA nullified. Southwest also contends that the City's HCP (*i.e.*, the Subarea Plan and the MSCP Plan) does not meet the requirements of the ESA. Given the scope of the action, Applicants' projects that are in the pipeline for design and mitigation assurances and approval under the IA may be affected whether or not they impacted the vernal pool species.[2]

We also conclude that the Builders have adequately demonstrated that they have legally protectable interests based on declarations submitted with the motion to intervene. Declarations of officers of BILDF, NAHB, BIA/SD, and CBIA state that several members of each association own land within the City Subarea containing vernal pools, and that members have developed land in reliance on the take authority in the City's ITP granted pursuant to the IA. Three of these associations also in submitted declarations state that "[p]ursuant to the City's IA, [Builders'] members who develop their land in reliance on the incidental take authority provided to the City are express third-party beneficiaries of such authority in the City's IA."

■■■■■ The district court did not find a legally protectable interest, reasoning that the Builders "have failed to identify how much land their members own within the City, whether this land contains vernal pools, whether their members have obtained approvals from the City to develop their projects pursuant to the City's ITP, and how such projects will be affected by the relief requested by plaintiffs." However, these declarations are sufficient at this procedural stage even without specifying the project developer or intervention by specific developers.[3] The Builders have

2. Despite the fact that the City's ITP list of covered species includes the vernal pool species and Southwest's First Amended Complaint relies on their listing, Southwest now contends that the City's ITP does not provide the City with authority to take the seven vernal pool species. Southwest argues that because the vernal pool species are located on wetlands within the U.S. Army Corps of Engineers' jurisdiction, they are not subject to the City's ITP, but to a separate take authorization process. This issue is properly a subject of the underlying litigation, and we do not take any position on the merits of the issue here.

3. While the Supreme Court has declined to decide whether a would-be intervenor under Rule 24(a)(2) must satisfy Article III's standing requirements, *Diamond v. Charles*, 476 U.S. 54, 68–69, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), we have in the past acknowledged that the "standing requirement is at least implicitly addressed by our requirement that the applicant must 'assert[ ] an interest relating to the property or transaction which is the subject of the action.'" *Portland Audubon*, 866 F.2d at 308 n. 1. Because Southwest challenges the Builders' associational standing to represent its members, we refer here to the three-prong test that an organization must meet to establish such standing:

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

legal protectable interests for the same reason as Pardee: they sufficiently allege that their members have projects that are in the pipeline for approved projects. We conclude that the Builders have sufficiently alleged that some of their members are third-party beneficiaries of assurances for projects in the approval process under the IA, and their interests could be affected if the IA were invalidated.[4]

## III. *Impairment of Applicants' Interests*

Because we conclude that Applicants have demonstrated a significantly protectable interest, we must determine whether these interests would as a practical matter be impaired or impeded by the disposition of this action. The record is sufficiently developed on this issue for our de novo review. *See FCC,* 66 F.3d at 1498.

■ We follow the guidance of Rule 24 advisory committee notes that state that "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." Fed.R.Civ.P. 24 advisory committee's notes. *See also FCC,* 66 F.3d at 1498.

■ Relief requested by Southwest would affect Applicants' interests here. For the projects on the negotiated list that are in the pipeline for design and mitigation assurances and approval pursuant to the IA, an invalidation of the IA would both legally and practically affect Applicants' interests. Similarly, any relief revoking all or part of the City's ITP would adversely affect the IA and thereby Applicants' projects approved pursuant to it.

## IV. *Inadequacy of Representation by Existing Parties*

■ The district court concluded that even if Applicants' interests were legally protectable, they were already adequately represented by existing parties. In determining whether a would-be intervenor's interests will be adequately represented by an existing party, courts consider:

(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect.

*NFRC,* 82 F.3d at 838 (citing *California v. Tahoe Reg'l Planning Agency,* 792 F.2d 775, 778 (9th Cir.1986)). The prospective intervenor bears the burden of demonstrating that the existing parties may not adequately represent its interest. *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d

the participation of individual members in the lawsuit.
*Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See also Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141, 1147 (9th Cir.2000); *Sierra Club v. Glickman,* 82 F.3d 106, 110 (5th Cir.1996) (applying the first two *Hunt* factors in finding that the American Farm Bureau Federation, a trade organization of farmers, met requirements for associational standing to support intervention of right). The Builders have shown that these factors are satisfied: (1) members have a legally protectable interest sufficient for intervention; (2) the defense of the IA and the MSCP planning process are germane to the associations' purposes; and (3) individual project proponents are not necessary participants in the suit.

4. Because we find Applicants' status as *current* third-party beneficiaries a legally protectable interest, we need not reach Applicants' alleged interests as intended *future* third-party beneficiaries of the IA or intended *future* reliance on the incidental take authority and assurances in the IA and the Plans.

525, 528 (9th Cir.1983). However, the burden of showing inadequacy is "minimal," and the applicant need only show that representation of its interests by existing parties "may be" inadequate. *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). In assessing the adequacy of representation, the focus should be on the "subject of the action," not just the particular issues before the court at the time of the motion. *Sagebrush,* 713 F.2d at 528.

 The district court ruled that Applicants did not meet this prong because both Applicants and the City shared the same "ultimate objective" in defending the issuance by FWS of the City's ITP and defending the IA. We have held that where "an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises." *NFRC,* 82 F.3d at 838 (internal quotation marks omitted). Applicants contend that *NFRC* can be distinguished because the "ultimate objective" in that case "had a much narrower connotation."

In *NFRC,* a timber association brought a declaratory judgment action to force the Secretaries of Agriculture and Interior to release timber sales contracts. *Id.* at 828. The dispute concerned interpretation of two statutes: the timber association argued that the statutes should be interpreted to require release of timber sale contracts from 1989 to 1995, and the Secretaries urged an interpretation releasing the contracts only from 1989 to 1990. *Id.* In finding representation adequate, we concluded that the groups and the government shared the same "ultimate objective" in the more restrictive interpretation of the statutes.[5] *Id.* at 838.

There is some question whether the presumption of adequacy applies at all here because complexity makes the determination of an "ultimate objective" in this case more difficult than in *NFRC.* But even if the presumption applies, it is rebutted here because Applicants and Defendants do not have sufficiently congruent interests.

While the City states that it believes it shares with Applicants the same "ultimate objective" in the preservation of the "MSCP and ITP," the City itself notes two ways in which those interest might diverge: (1) the City's range of considerations in development is broader than the profit-motives animating developers; and (2) developers have different duties under the Plans relating to mitigation. Just as the City could not successfully negotiate the Plans without some private sector participation from Applicants, so too the City in this case cannot be expected successfully to safeguard Applicants' legally protectable interests. Indeed, the City's response to the Applicants' motion acknowledges that it "will not represent proposed intervenors' interests in this action." Moreover, FWS, a federal agency, and other defendants also cannot be expected under the circumstances presented to protect these private interests. Applicants would likely offer important elements to the proceedings that the existing parties would likely neglect. The priorities of the defending government agencies are not simply to confirm the Applicants' interests in the Plans, the IA, and the City's ITP. The interests of government and the private sector may diverge. On some issues Applicants will have to express their own unique private perspectives and in essence

5. *See also League of United Latin American Citizens v. Wilson,* 131 F.3d 1297, 1305 (9th Cir.1997) (concluding that an applicant for intervention who shared with California state defendants an interest in upholding the constitutionality of a ballot proposition shared the same ultimate objective as defendants).

carry forward their own interests in the IA.

The district court concluded that Applicants had not "identif[ied] any argument that the City is either incapable or unwilling to make ... or any necessary elements that applicants will bring to these proceedings that the City will neglect." But it is not Applicants' burden at this stage in the litigation to anticipate specific differences in trial strategy. It is sufficient for Applicants to show that, because of the difference in interests, it is likely that Defendants will not advance the same arguments as Applicants. Resolution of this case will decidedly affect Applicants' legally protectable interests and "there is sufficient doubt about the adequacy of representation to warrant intervention." *Trbovich,* 404 U.S. at 538, 92 S.Ct. 630.

## CONCLUSION

We reverse the district court's order denying Applicants' motion for leave to intervene as of right.[6]

**REVERSED and REMANDED.**

---

6. Because we conclude that Applicants are entitled to intervene as a matter of right, we do not reach the issue of whether the district court properly denied permissive intervention or Applicants' motion to reconsider the denial of intervention.