**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DBSI/TRI IV LIMITED
PARTNERSHIP, an Idaho limited
partnership; FOREST HILLS
INVESTORS OF COQUILLE, OREGON
LTD., an Oregon limited
partnership; JADIN INVESTMENTS,
LTD., an Oregon limited
partnership; NORSEMAN VILLAGE, an
Oregon limited partnership;
PARKSIDE DEVELOPMENT, an Oregon
limited partnership,
                          *Plaintiffs,*

           and

SHERRY GOLDAMMER; DONALD
GERHARD; RON VEILLON; CARMEN
THOMAS; DIANA RHODES,
                          *Appellants,*

           v.

UNITED STATES OF AMERICA,
                 *Defendant-Appellee.*

No. 04-36066

D.C. No.
CV-98-01325-AJB

SHERRY GOLDAMMER; DONALD
GERHARD; RON VEILLON; CARMEN
THOMAS; DIANA RHODES,
                    *Plaintiffs-Appellants,*

                    v.

FOREST HILLS INVESTORS OF
COQUILLE, OREGON LTD., an
Oregon limited partnership; JADIN
INVESTMENTS, LTD., an Oregon
limited partnership; NORSEMAN
VILLAGE, an Oregon limited
partnership,

                    *Defendants,*

                    and

ANN VENEMAN, in her official
capacity as secretary of the United
States Department of Agriculture;
DBSI/TRI IV LIMITED
PARTNERSHIP; DBSI REALTY CORP.,
an Idaho corporation; NORTHWEST
REAL ESTATE CAPITAL
CORPORATION, an Idaho
corporation; DBSI/TRI VII,
                    *Defendants-Appellees.*

No. 05-35748

D.C. No.
CV-03-01749-AJB

OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
September 13, 2006—Portland, Oregon

Filed October 3, 2006

Before: Michael Daly Hawkins, Barry G. Silverman, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Silverman

**COUNSEL**

Arthur Schmidt, Oregon Law Center, Portland, Oregon, argued the cause for the appellant. Michelle Ryan, Oregon Law Center, was on the briefs.

Robert E. Bakes, Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise, Idaho, argued the cause for appellee DBSI. Andrew R. Gardner, Stoel Rives, Portland, Oregon, was on the brief.

Kelly A. Zusman, Assistant United States Attorney, Portland, Oregon, argued the cause for appellee United States. John Muson, Special Assistant United States Attorney, Portland, Oregon, was on the brief.

**OPINION**

SILVERMAN, Circuit Judge:

This consolidated appeal concerns the prepayment of a Section 515 loan by owners of low-income housing in Oregon contrary to the prepayment procedures required by the Emergency Low Income Housing Protection Act of 1987, 42 U.S.C. § 1472 ("ELIHPA"). Appellants are residents who presently live in this housing property.

First, they appeal the district court's denial of their motion to intervene in a quiet title lawsuit, *DBSI/TRI IV Limited Part-*

*nership, et al. v. United States*, No. 04-36066, between the property owners and the Rural Housing Service ("RHS"), an administrative division of the United States Department of Agriculture. Second, appellants appeal the district court's grant of summary judgment in favor of the owners and RHS in appellants' Administrative Procedure Act ("APA") claim, which alleged that RHS accepted prepayment on a Section 515 loan in violation of ELIHPA.

We affirm the district court's denial of appellants' motion to intervene in the quiet title lawsuit because their interests are sufficiently protected by their APA lawsuit. However, because the district court misconstrued our holding in *Kimberly Associates v. United States*, 261 F.3d 864 (9th Cir. 2001), we reverse the grant of summary judgment and remand for further proceedings. *Kimberly* merely held that certain defenses were not available to the government *in a quiet title action* brought by Section 515 borrowers to enforce their contractual right to prepay their loans. However, ours is an APA case brought by residents challenging the agency's non-compliance with the Emergency Low Income Housing Protection Act. *Kimberly* did not hold that ELIHPA was invalid or that the Department of Agriculture was free to violate it. The district court therefore erred in granting summary judgment to the agency on the tenants' claim that the agency acted contrary to law.

## I.   *Background*

The facts are not disputed.

Section 515 of the National Housing Act of 1949 was enacted by Congress to encourage private investment in housing for elderly and low-income individuals in rural areas. *See* 42 U.S.C. § 1471 *et seq.* Section 515 authorized the Farmers Home Administration, which was later subsumed into RHS, to make direct loans to finance affordable housing. In exchange for favorable interest rates and operating subsidies,

the housing owners agreed to rent to qualified low-income tenants at affordable rates for as long as the loans were outstanding.

Defendant-appellees DBSI/TRI IV, Forest Hills, Jadin, Norseman, and DBSI/TRI VII (hereinafter collectively "DBSI") entered into loan agreements with RHS in the mid-to late- 1970s to finance six properties: Forest Village, Seacrest, Hillside Terrace, Vittoria Square, Norseman Village, and Meadowbrook I. The loan agreements gave DBSI the right to prepay the loans and exit the Section 515 program at any time, even before the 40- or 50-year terms of the loans expired, stating: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." The loan agreements also provided: "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof."

Plaintiff-appellants are six tenants currently residing in these properties. Sherry Goldammer, Donald Gerhard, Ron Veillon, and Carmen Thomas are elderly low-income residents of Seacrest; Diana Rhodes is a low-income resident of Meadowbrook.

In 1987, Congress enacted ELIHPA. Pub. L. No. 100-242, 101 Stat. 1877 (1988).[1] In passing this legislation, Congress was motivated by concerns that RHS loans were vulnerable to prepayment, which removed housing from Section 515 ahead of schedule, thus undermining the purpose of the program.

---

[1] In 1992, Congress extended and made permanent the 1988 Act, which had only temporarily prohibited prepayment. Pub. L. No. 102-550, 106 Stat. 3672, 42 U.S.C. § 1472(c)(1) (1992). The 1992 amendment also extended prepayment restrictions to all Section 515 projects financed between December 21, 1979, and December 15, 1989. *Id.* The 1988 Act had restricted prepayments on projects financed on or before December 21, 1979. It is undisputed that the loans in question are covered by ELIHPA.

Thus, Congress imposed "elaborate requirements for prepayments" in order to "discourage project owners from prepaying their loans," despite the terms of the loan contracts. *Kimberly*, 261 F.3d at 867. ELIHPA provides, in pertinent part:

> The Secretary may not accept an offer to prepay . . . any loan made or insured under [Section 515] . . . unless the Secretary takes appropriate action which will obligate the borrower (and successors in interest thereof) to utilize the assisted housing and related facilities for the purposes specified in [Section 515], as the case may be, for a period of [fifteen or twenty years, depending on the type of loan], or until the Secretary determines (prior to the end of such period) that there is no longer a need for such housing and related facilities to be so utilized or that Federal or other financial assistance provided to the residents of such housing will no longer be provided.

42 U.S.C. § 1472(c)(1)(A).

Specifically, ELIHPA requires an owner to give notice of its intent to prepay, 42 U.S.C. § 1472(c)(3), at which point the Secretary of Housing and Urban Development ("HUD") must offer the owner a series of financial incentives to remain in the program, *id*. § 1472(c)(4). If the owner insists on prepaying, the owner is obligated to offer the project for sale to any "qualified nonprofit organization or public agency at a fair market value" determined by independent appraisers. *Id*. § 1472(c)(5)(A)(I). If no such sale is made within 180 days, then and only then may RHS accept prepayment. *Id*. § 1472(c)(5)(A)(ii).[2] The prepayment process is subject to

---

[2]If a qualified nonprofit organization does offer to buy the property, RHS is authorized to facilitate the sale by providing financial assistance "to ensure that the monthly rent payment made by each low income family or person residing in the housing does not exceed the maximum rent permitted" by Section 515. 42 U.S.C. § 1472(c)(5)(C)-(D).

agency regulations now found at 7 C.F.R. Part 3560 *et seq.* (2005).

In 1998, DBSI submitted final payments on their loans on four Section 515 properties, including Seacrest. No prepayment was offered for Meadowbrook I. RHS, relying upon ELIHPA and the accompanying regulations, refused to accept the prepayment tenders and refused to reconvey the deeds of trust or issue satisfactions of the mortgages that encumbered the properties.

On October 27, 1998, DBSI filed a quiet title lawsuit against the United States in the District of Oregon. In its complaint, DBSI claimed that they were entitled to quiet title judgments because RHS wrongfully rejected the 1998 prepayment tenders.

On February 28, 2003, DBSI and RHS entered into an "Agreement in Principle" to settle the quiet title lawsuit. DBSI and RHS agreed to negotiate values for the four properties involved in the quiet title lawsuit, as well as for Meadowbrook I, and to offer the properties initially to non-profit entities that would keep the properties in Section 515. If no such sale occurred, however, the Agreement provided that RHS would accept DBSI's prepayment and release the properties from Section 515 "without regard to any prepayment restrictions, including but not limited to the restrictions contained in 42 U.S.C. § 1472(c) and 7 C.F.R. 1965.201 *et seq.*"

Although DBSI and RHS agreed to values for the four properties, the government did not agree to finance the sale of these properties to nonprofit entities. Therefore, pursuant to the Agreement, DBSI paid the balance of the loan for Seacrest on October 28, 2003 and the government accepted this prepayment on December 1, 2003. On December 15, 2003, RHS reconveyed the deed of trust for the Seacrest property and released Seacrest from the Section 515 program. On December 19, 2003, DBSI and RHS stipulated to a quiet title judg-

ment pursuant to Fed. R. Civ. P. 54(b).[3] Also on December 19, 2003, appellants — the tenants — brought suit against the Secretary of the Department of Agriculture and various other federal defendants under the Administrative Procedure Act, 5 U.S.C. § 702, alleging that the agency acted contrary to law in allowing DBSI to exit the Section 515 program without complying with ELIHPA.

It is undisputed that RHS accepted prepayment of the Seacrest loan without requiring DBSI to comply with the requirements of ELIHPA.

After prepaying the Seacrest loan, DBSI conveyed Seacrest to Northwest Real Estate Capital Corporation ("Northwest"), which had previously purchased Seacrest from DBSI. Northwest eventually procured United States HUD Section 8 housing vouchers for the Seacrest tenants from a local housing authority, allowing the tenants to continue paying below-market rents.

DBSI has not initiated prepayment of the Section 515 loan on Meadowbrook I.

## II. *Motion to Intervene*

Approximately one month after DBSI and RHS stipulated to the quiet title judgment in the *DBSI/TRI IV* lawsuit, appellants filed their motion to intervene as of right in that action, pursuant to Fed. R. Civ. P. 24(a), seeking the opportunity to set aside the quiet title judgment on the ground that it was issued in violation of ELIHPA. The district court denied the motion on the grounds that appellants' APA claim sufficiently protected their interests. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

---

[3]Pursuant to the stipulation, the district court entered an order of dismissal with prejudice on June 5, 2006.

A district court's denial of a motion to intervene is reviewed de novo. *See United States v. Alisal Water Corp.*, 370 F.3d 915, 918 (9th Cir. 2004).

[1] As a preliminary matter, DBSI contends that the June 5, 2006, dismissal with prejudice of the quiet title lawsuit moots appellants' appeal of the denial of their motion to intervene. The law is otherwise. Although the district court entered final judgment in the underlying case during the pendency of the appeal, "the intervention controversy is still alive because, if it were concluded on appeal that the district court had erred in denying the intervention motion, and that the applicant was indeed entitled to intervene in the litigation, then the applicant would have standing to appeal the district court's judgment." *Canatella v. California*, 404 F.3d 1106, 1109 n.1 (9th Cir. 2005) (citing *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1301 n.1 (9th Cir. 1997)) (internal punctuation omitted); *see also Leisnoi, Inc. v. United States*, 313 F.3d 1181, 1184 n.4 (9th Cir. 2002) (refusing to dismiss for mootness and reaching merits of appeal because appellant's motion "might not be moot if intervention would permit him to appeal the judgment of dismissal") (citing *Wilson*, 313 F.3d at 1301 n.1). Therefore, we proceed to the merits of the claim.[4]

[2] To intervene as of right under Rule 24(a), appellants must meet all elements of the four-part test set out in *Southwest Center For Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001):

> "(1) the application for intervention must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the property or transaction that is the subject of the action; (3) the applicant

---

[4]Meadowbrook appellant Rhodes does not appeal the district court's ruling that she did not have a protectable interest in the quiet title lawsuit, in which Meadowbrook was not at issue. Therefore, we address only the Seacrest appellants' claim.

must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit."

**[3]** We agree with the district court that appellants failed to meet the third factor — i.e., they failed to demonstrate that "the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest." *Id*. The relief sought by appellants in their APA action is essentially the same relief they say they wish to obtain by intervening in the quiet title lawsuit. Under the APA, the district court has the power to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see, e.g.*, *Lifgren v. Yeutter*, 767 F. Supp. 1473, 1494 (D. Minn. 1991) (setting aside RHS acceptance of Section 515 prepayment in similar case, and ordering property returned to Section 515 to be operated in accordance with ELIHPA). Therefore, if successful on the APA claim, appellants will receive the same remedy they sought by intervening in the quiet title lawsuit. The action to intervene was correctly denied.

### III.  APA Claim

#### A.  Justiciability

On appeal, for the first time in the case, DBSI and RHS raise various issues of justiciability. Standing, mootness, and ripeness are jurisdictional issues that may be raised at any time, even for the first time on appeal. *See, e.g.*, *Laub v. U.S. Dept. of Interior*, 342 F.3d 1080, 1085 (9th Cir. 2003).

**[4]** The APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. To estab-

lish standing to sue under the APA, appellants must first meet the " 'irreducible constitutional minimum of standing [which] contains three elements: (1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury.' " *Schneider v. Chertoff*, 450 F.3d 944, 959 (9th Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A party suing under the APA must also show "(1) that there has been final agency action adversely affecting the [party], and (2) that, as a result, it suffers legal wrong or that its injury falls within the zone of interests of the statutory provision the [party] claims was violated." *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 976 (9th Cir. 2003) (internal quotation marks and citations omitted).

RHS argues that appellants lack standing because they have not suffered injury in fact, given that Meadowbrook remains in the Section 515 program and Seacrest is now involved in HUD's Section 8 program.

[5] As to Seacrest appellants, it is undisputed that Northwest has not increased their rent as the result of moving Seacrest from Section 515 to Section 8. However, it is also undisputed that Section 515 offers procedural safeguards and statutory protections that are unavailable under Section 8. For example, at the end of a lease under Section 8, the landlord may refuse to renew the lease consistent with state law, generally for no cause; 42 U.S.C. § 1437f(o)(7); Section 515 landlords may refuse to renew a lease only for "material noncompliance" with lease terms or for other "good causes." 7 C.F.R. § 3560.159 (2005).[5] "It has long been clear that eco-

---

[5]Other differences between Section 8 and Section 515 include the fact that Section 515 rent cannot be raised to more than 30% of the tenant's monthly adjusted income, 7 C.F.R. § 3560.203(a)(1), whereas Section 8 assistance could require tenants to pay more than 30% of their monthly adjusted income under certain circumstances. *See* 42 U.S.C. §§ 1437f(o)(2)(A), 1437f(o)(3). Also, Section 8 tenants do not enjoy the statutory right to grievance and appeals procedures provided by Section 515. *Compare* 42 U.S.C. § 1480(g) *with* 7 C.F.R. § 3560.160.

nomic injury is not the only kind of injury that can support a plaintiff's standing." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262-63 (1977) (citations omitted). Moreover, parties such as appellants have been "allowed to bring lawsuits challenging actions which affect their future opportunity to obtain housing." *Lifgren*, 767 F. Supp. at 1488 n.7 (citing *Arlington Heights*, 429 U.S. at 264 and *Allen v. Pierce*, 689 F.2d 593, 595 n.5 (5th Cir. 1982)); *see also Keith v. Volpe*, 858 F.2d 467, 477 (9th Cir. 1988) (holding that tenants had standing where defendant city's housing plans caused injury by making affordable housing unavailable to tenants) (citing *Arlington Heights*, 429 U.S. at 264).

**[6]** Seacrest appellants suffered injury in fact when their housing status changed. This change allegedly was caused by the agency's action, and appellants' injuries are redressable by a successful claim under the APA. Therefore, we hold that Seacrest appellants have standing to sue.

**[7]** However, because Meadowbrook appellant Rhodes has not yet suffered concrete injury, nor is injury sufficiently imminent, we hold that she lacks standing and that her APA claim is not ripe for review. Where, as here, "injunctive relief and a declaratory judgment are sought with regard to an administrative determination, the courts traditionally have been reluctant to grant such relief unless there is a controversy ripe for judicial resolution." *Mt. Adams Veneer Co. v. United States*, 896 F.2d 339, 343 (9th Cir. 1990) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)) (internal punctuation omitted).

**[8]** " '[A] case is not ripe where the existence of the dispute itself hangs on future contingencies that may or may not occur.' " *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) (quoting *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996)). It is undisputed that DBSI has not tendered prepayment on the Meadowbrook I loan, nor has it indicated an intention to do so. Moreover, Rhodes has not shown that she

has been "adversely affected" by "final agency action" — specifically, RHS's acceptance of prepayment — as required for standing under the APA. *See Citizens for Better Forestry*, 341 F.3d at 976.

**[9]** Finally, respondents argue that Seacrest appellants' claim is mooted by the sale of the Seacrest property to Northwest. This is not so. We have held that "[c]onveyance of property to another does not moot a case." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 815 (9th Cir. 1999) (citation omitted). Federal courts "are authorized to 'void a property transaction' where necessary." *Id.* (quoting *Nat'l Wildlife Fed. v. Espy*, 45 F.3d 1337, 1342 (9th Cir. 1995)); *see also Goodwin v. United States*, 935 F.2d 1061, 1064 (9th Cir. 1991) (rejecting mootness argument because court could "still determine the validity" of seller's acquisition of property before it was sold to eventual buyer). "Where the actions involved in a title transfer can be undone, this court will not find meritorious the defense of mootness." *Muckleshoot*, 177 F.3d at 815 (citing *Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115 (9th Cir. 1980)). Because the sale to Northwest can be undone and the prepayment reversed, the claim is not moot. *See, e.g.*, *Lifgren*, 767 F. Supp. 1473 (setting aside the borrower's prepayment in a similar APA action).

## B.  *Kimberly*  and Summary Judgment

A district court's grant of summary judgment is reviewed de novo. *See Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006). Viewing the evidence in the light most favorable to the non-moving party, we determine whether there are "any genuine issues of material fact and whether the district court correctly applied the controlling substantive law." *Id.*

In its orders denying the preliminary injunction and granting summary judgment in favor of defendants, the district court ruled that its decision "was mandated" by the Ninth Cir-

cuit's decision in *Kimberly Associates v. United States*. We disagree. There is a critical distinction between *Kimberly* and the present case. *Kimberly* was a quiet title action in which borrowers claimed to be entitled to pay off their loans in accordance with their contracts. In the present case, the question is entirely different — whether the agency acted contrary to federal law in failing to comply with ELIHPA to the detriment of the residents.

*Kimberly* involved a dispute similar to the *DBSI/TRI IV* quiet title lawsuit, in which Kimberly Associates (a subsidiary of DBSI) attempted prepayment of a Section 515 loan on a property in Idaho. *Kimberly*, 261 F.3d at 867. When RHS rejected the prepayment, citing ELIHPA, Kimberly sued to quiet title of the Idaho property. *Id.* The government moved to dismiss pursuant to Fed. R. Civ. P. 12(b), raising two initial defenses: sovereign immunity and the unmistakability doctrine.[6]

---

[6]Without doubt, there is substantial inconsistency in courts' descriptions of "the unmistakability doctrine." *See, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 871-72 (1996) (defining unmistakability doctrine as the notion that "[s]overeign power . . . governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms," but then holding that "application of the doctrine . . . turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government"); *First Nationwide Bank v. United States*, 431 F.3d 1342, 1351-52 (Fed. Cir. 2005) (discussion that unmistakability doctrine and sovereign acts doctrine are separate); *Kimberly*, 261 F.3d at 869 (trying to clarify the analysis that must be undertaken under the "so-called 'unmistakability doctrine' "); *Rhode Island Laborers' Dist. Council v. Rhode Island*, 145 F.3d 42, 44 (1st Cir. 1998) (discussing "[w]hat has been called the 'unmistakability doctrine' "); *Tamarind Resort Assocs. v. Virgin Islands*, 138 F.3d 107, 112 (3d Cir. 1998) (unclear after *Winstar* what type of contract the unmistakability doctrine applies to).

As we read *Kimberly*, the "unmistakability doctrine" refers to the second step in the two-step "unmistakability analysis": the first step is to determine if the act in question qualifies as a "sovereign act," and it is only after the act is deemed "sovereign" that the question of an "unmistakable waiver" of the government's sovereign power becomes relevant. See *Kimberly*, 261 F.3d at 869. Therefore, to say that the unmistakability doctrine does not apply (as we do here) is to say that the court need not reach the second step of the unmistakability analysis because the act in question is not a sovereign act.

*Id.* The district court ruled that the United States had waived sovereign immunity under 28 U.S.C. § 2410, but that "the unmistakability doctrine nevertheless barred Kimberly from any remedy under its contract with the government." *Id.* The court then granted the government's motion to dismiss.

**[10]** On appeal from the motion to dismiss, we agreed with the district court that sovereign immunity had been expressly waived, but held that the unmistakability doctrine *did not* apply. When the doctrine applies, it is a defense available to the government when the complaining party in a contract dispute claims that the original contract terms control, even when they conflict with subsequent legislation. Then, the court determines whether, in the contract language, the government waived its sovereign right to affect the contract through legislation "in unmistakable terms." *See United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996) ("Sovereign power governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.") (citation and internal punctuation omitted); *Kimberly*, 261 F.3d at 869 (The doctrine allows "the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise.") (internal quotation marks and citation omitted). As we noted in *Kimberly*, this doctrine "governs the tension between the exercise of sovereign power and private contractual relations with the government." 261 F.3d at 869.

However, the unmistakability doctrine does not apply to every situation in which legislation affects a prior government contract. As we noted, "when the government is acting as a private contracting party, then the doctrine does not apply, and the government's rights and duties are governed by law applicable to private parties unaltered by the government's sovereign status." *Id*. (citations omitted).

**[11]** We divided the inquiry into two questions: "(1) in what capacity was the United States acting when it breached

its contractual obligations? and (2) if the United States acted in its sovereign capacity, did the contract waive sovereign rights in unmistakable terms?" *Id.* In answering the first question, we held in *Kimberly* that, because ELIHPA was not an act of sovereign power, the government was not acting in a sovereign capacity when it altered the Section 515 loan contract.[7] *Id.* at 869-70. We thus held in *Kimberly* that the unmistakability doctrine did not apply, and the government could not use the doctrine as an initial defense warranting dismissal pursuant to Rule 12(b). *Id.* at 870.

**[12]** *Kimberly* remains good law as far as it goes, but nowhere does *Kimberly* hold that ELIHPA is invalid or that the government is free to disobey it. Bearing in mind that *Kimberly* was a quiet title action, we had no occasion then to opine on whether the government violated the APA by affirmatively allowing borrowers to ignore ELIHPA's statutory requirements.

**[13]** Thus, the district court erred in relying on *Kimberly* as the basis for granting summary judgment on the appellants' APA claim. On remand, the district court should decide whether RHS acted contrary to law as alleged in appellants' APA complaint.

We note that, if appellants' APA claim proves successful and Seacrest is returned to the Section 515 program, DBSI may still have recourse for RHS's apparent breach of contract. In *Franconia Associates*, 536 U.S. 129 (2002), the Supreme Court noted the availability of a damages action under the

---

[7]This decision created a split with the Eighth Circuit, which in similar ELIHPA cases had ruled that the unmistakability doctrine *did* bar the owners' attempts to circumvent ELIHPA in prepaying Section 515 loans. *See Charleston Hous. Auth. v. U.S. Dept. of Agric.*, 419 F.3d 729, 738 (8th Cir. 2005)*; Parkridge Investors Ltd. Partnership v. Farmers Home Admin.*, 13 F.3d 1192, 1198 (8th Cir. 1994).

Tucker Act, 28 U.S.C. § 1491, to compensate owners for contracts breached because of ELIHPA.[8]

[14] Because the district court erroneously relied on *Kimberly* in deciding the summary judgment motion, it never reached the merits of appellants' APA claim. We therefore reverse the grant of summary judgment and remand to the district court for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

[8]We recognize that the Supreme Court did not directly state that damages under the Tucker Act would be available in all circumstances; however, given the Court's resolution of the statute of limitations issue that was before it in *Franconia*, the Court seemed to imply the suitability of such a remedy.