**KIMBERLY ASSOCIATES, an Idaho limited partnership, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 99–35188.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 2000

Filed Aug. 17, 2001

takes a case out of the grids, the ALJ should call upon a vocational expert for help making the disability determination).

John C. Ward, Robert E. Bakes, Erik J. Bolinder; Moffatt, Thomas, Barrett, Rock & Fields; Boise, Idaho; attorneys for the plaintiff-appellant.

Nicholas J. Woychick, Assistant United States Attorney; Boise, Idaho; attorney for the defendant-appellee.

Before: REAVLEY,[1] FERNANDEZ and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

Kimberly Associates ("Kimberly"), owner of a low-income housing project in Twin Falls, Idaho, argues that it is not barred from bringing a quiet title action against the United States on property subject to a government loan. Under the circumstances presented by this case, we agree with the district court that the United States has waived sovereign immunity. However, we disagree that the unmistakability doctrine bars this action and remand for further proceedings.

## I

Congress enacted the Rural Rental Housing Program as part of the Housing Act of 1949, 42 U.S.C. § 1485, "to ameliorate housing shortages for the elderly and other low-income persons in rural areas." *Parkridge Investors Ltd. v. Farmers Home Admin.*, 13 F.3d 1192, 1195 (8th Cir.1994). The program authorized the Farmers Home Administration, which was later subsumed into the Rural Housing Service (collectively referred to as "RHS"), to make loans available on favorable terms—such as low interest rates, tax advantages, and rent subsidies—to finance the construction and purchase of rural rental property. In return, borrowers were obliged to rent units at affordable rates to low-income tenants for the duration of the loan.

On January 30, 1981, Kimberly entered into a loan agreement with RHS wherein RHS promised to loan Kimberly the funds to build a multi-family, low-income housing project ("the property") in Twin Falls, Idaho. The agreement imposed a variety of restrictions on Kimberly, including a cap on annual profits from the project, a prohibition on other borrowing, and a covenant to use the property as low income housing for twenty years even if Kimberly prepaid its RHS loan.

The loan was not closed until November 10, 1981, when Kimberly executed a promissory note in the amount of $620,000, payable over fifty years, bearing an interest rate of 11.5%. The promissory note provided that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of the Borrower."

The promissory note was secured by a real estate deed of trust owned by a private entity, Title and Trust Company ("Title & Trust"), an Idaho corporation. Pursuant to the transaction, Kimberly acquired the property in fee using the loaned funds, but conveyed all of its right, title and interest to Title & Trust, which acted as trustee for the RHS pursuant to the terms of the promissory note, trust deed, and loan agreement.

In 1987, Congress enacted the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100–242, 42 U.S.C. § 1472(c) ("ELIHPA"). In passing this legislation, Congress was motivated in part

---

1. The Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth Circuit, sitting by designation.

by concerns that RHS loans were "vulnerable to prepayment and therefore removal from the low-income market-thus, thwarting the basic purpose of the program." *Parkridge Investors*, 13 F.3d at 1195. Congress further amended the Housing Act in 1992, when it passed the Housing and Community Development Act of 1992, Pub.L. No. 102–550, 106 Stat. 3672 (1992), 42 U.S.C. §§ 1472, 1485 ("HCDA"). The intended effect of this legislation was to discourage project owners from prepaying their loans and removing units from the market. It did so by prohibiting prepayments of loans made after December 15, 1989, and imposing elaborate requirements for prepayments of loans extended between December 21, 1979 and December 15, 1989. 42 U.S.C. § 1472(c).

For loans in the latter category—such as Kimberly's—the statute requires the owner to provide notice of intent to repay the loan. The statute directs the Secretary of Housing and Urban Development ("Secretary"), upon receipt of such notice, to offer the project owner a series of financial incentives to maintain the project. 42 U.S.C. § 1472(c)(4)(B). If the owner still wishes to prepay, the owner is obligated to first offer the project for sale to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." 42 U.S.C. § 1472(c)(5)(A).

If no qualified buyer emerges within 180 days, the Secretary "may accept the offer to prepay, or may request refinancing ... of [ ] the loan." 42 U.S.C. § 1472(c)(5)(A)(ii). The Secretary promulgated regulations pursuant to this legislation establishing a prepayment process for RHS project owners wishing to prepay their loans. 7 C.F.R. Part 1965–E. The effect of the legislation and implementing regulation was to extend Kimberly's obligation to provide low-income housing for another thirty years, capped at an 8% annual profit, unless Kimberly was allowed by the Secretary to pre-pay under the new regulatory scheme.

By the fall of 1997, the government had accepted prepayments from Kimberly of nearly all of the loan principal without subjecting Kimberly to the regulatory procedure. On November 24, 1997, Kimberly tendered the final and full prepayment of the $5,979.06 remaining on the loan. However, the agency refused to accept this final payment on the loan, and instead sought to compel Kimberly to comply with the regulatory pre-payment procedure, labeled by RHS as its "Prepayment and Displacement Prevention" program. 7 C.F.R. § 1965.205. This lawsuit ensued.

Both parties stipulated to have a full and final disposition by a magistrate judge. Kimberly has tendered its final payment to the Clerk of the Court, and seeks to have its debts declared to be discharged by this court. The United States moved to dismiss the lawsuit under Federal Rule of Civil Procedure 12(b).

■ The magistrate judge found that (1) the court had jurisdiction over the claims under 28 U.S.C. § 1331; (2) the United States waived sovereign immunity under 28 U.S.C. § 2410(a); and (3) the unmistakability doctrine nevertheless barred Kimberly from any remedy under its contract with the government. We have subject matter jurisdiction under 28 U.S.C. § 1331. *See North Side Lumber Co. v. Block*, 753 F.2d 1482, 1484 (9th Cir.1985) ("federal common law of contracts applies to contracts with the federal government ... and federal common law is part of the 'laws ... of the United States' for the purpose of § 1331 jurisdiction."). We review de novo the district court's dismissal for lack of subject matter jurisdiction. *Brady v. United States*, 211 F.3d 499, 502 (9th Cir.2000).

## II

■ The district court did not err in concluding that the United States waived sovereign immunity to this suit. Kimberly seeks relief under 28 U.S.C. § 2410, which waives sovereign immunity for quiet title suits involving the government. Specifically, section 2410(a) provides that "the United States may be named a party in any civil action or suit in any district court ... (1) to quiet title to ... real or personal property on which the United States has or claims a mortgage or other lien." *Id.* Kimberly has tendered final payment on the loan to the agency; thus, Kimberly contends that it is entitled to receive clear title pursuant to the transactional documents. Because the title cloud of the government's security interest remains, Kimberly argues that it is entitled to a statutory quiet title determination. Kimberly's claims are covered by the plain language of § 2410: Kimberly named the United States as a party in an action to quiet title to real property on which the United States claims a mortgage or lien. *See id.* Thus, Kimberly has properly framed its claim as an action to quiet title under the statute. *See Harmon v. Farmers Home Admin.*, 101 F.3d 574, 586 (8th Cir.1996).

A comparison between § 2410 and its companion provision, 28 U.S.C. § 2409a, the Quiet Title Act, supports this conclusion. Section 2409a, like § 2410, provides a limited waiver of sovereign immunity in certain quiet title actions. However, § 2409a applies where the United States claims an interest "other than a security interest." 28 U.S.C. § 2409a(a). *See, e.g., Bertie's Apple Valley Farms v. United States*, 476 F.2d 291, 292 (9th Cir.1973) (per curiam) (finding § 2410 inapplicable where the United States claims a title interest, rather than a mortgage or other lien interest). Because the government's asserted right to the property is a security interest, the United States has waived sovereign immunity as to actions seeking to quiet title against that interest pursuant to § 2410.

■ The government argues that § 2410 is inapplicable, because the basis of Kimberly's claim is contractual or injunctive and therefore not properly a suit to quiet title. As we have previously noted, the text of § 2410 contains no such limitation. *Hamilton v. Nakai*, 453 F.2d 152, 159 (9th Cir.1971) (explaining that § 2410 "contains no explicit provision for or against injunctive relief"). To the contrary, § 2410 unambiguously waives sovereign immunity in "any civil action" where an individual seeks to quiet title to real property on which the United States has a lien. In addition, "nothing in [section 1340] or for that matter in section 2410 itself prescribes the remedial details of the quiet-title action, and for these the courts have usually turned to state law." *Harrell v. United States*, 13 F.3d 232, 234–35 (7th Cir.1993) (citing *United States v. Brosnan*, 363 U.S. 237, 241–42, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960)). Idaho takes a fairly expansive view of quiet title actions, holding that a quiet title action may be brought "upon any legal theory or set of probative facts which may be employed to establish [ ] ownership." *Aldape v. Akins*, 105 Idaho 254, 668 P.2d 130, 136 (App.1983). Indeed, Idaho has specifically allowed a quiet title action to proceed under the theory that the defendant wrongfully refused tender of payment. *Kelley v. Clark*, 23 Idaho 1, 129 P. 921, 924 (1913). Of course, the fact that an action is cognizable is not equivalent to a right to a declaration quieting title. However, the fact that the claim may be, in part, contractually-based, is no bar to an action proceeding against the United States under § 2410.

### III

Having concluded that the quiet title action is cognizable under § 2410, we must decide whether the unmistakability doctrine bars it. In considering this issue, we begin with the general rule that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). This general rule is limited by the existence of sovereign power; in other words, every contract is presumed not to interfere with the sovereign power of the United States to legislate. "Sovereign power ... governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *United States v. Winstar Corp.,* 518 U.S. 839, 872, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

Thus, the so-called "unmistakability doctrine," which governs the tension between the exercise of sovereign power and private contractual relations with the government, allows "the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise." *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578 (Fed.Cir.1997), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998). In cases where the unmistakability doctrine applies, it is demanding: it holds that for the United States to waive its sovereign rights when entering into a contract with a private citizen, it must do so in unmistakable terms.

However, when the government is acting as a private contracting party, then the doctrine does not apply, and the government's rights and duties are governed by law applicable to private parties unaltered by the government's sovereign status. *Winstar,* 518 U.S. at 895, 116 S.Ct. 2432; *Mobil Oil Exploration, Prod. Southeast, Inc. v. United States,* 530 U.S. 604, 619, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000).

Thus, an unmistakability doctrine analysis requires examination of two questions: (1) in what capacity was the United States acting when it breached its contractual obligations? and (2) if the United States acted in its sovereign capacity, did the contract waive sovereign rights in unmistakable terms? In this instance, we need not reach the second question, because we conclude that the United States was not acting in a sovereign capacity when it altered its contract with Kimberly.

In describing when the unmistakability doctrine applies, the *Winstar* plurality explained that

> [t]he cases extending back into the 19th century thus stand for a rule ... that applies when the Government is subject either to a claim that its contract has surrendered a sovereign power (e.g., to tax or control navigation), or to a claim that cannot be recognized without creating an exemption from the exercise of such a power (e.g., the equivalent of exemption from Social Security obligations). The application of the doctrine thus turns on whether enforcement of the contractual obligations alleged would block the exercise of a sovereign power of the Government.

*Gen. Dynamics Corp. v. United States,* 47 Fed. Cl. 514, 542 (2000) (quoting *Winstar,* at 878–79, 116 S.Ct. 2432). "It seems clear from the foregoing language that what the Supreme Court ... had in mind when [it] referred to sovereign power was that power exercised by government for 'public and general' purposes, as opposed to releasing government from its contractual obligations." *Gen. Dynamics,* 47 Fed. Cl. at 542.

It is unquestionable that, when it altered the terms of its contract with Kimberly, the government was not acting in a "public and general" capacity. The provisions of the 1992 amendments to ELIHPA applicable to Kimberly's situation constituted a narrow, targeted piece of legislation aimed at relieving the government from onerous provisions contained in a finite number of specific contracts it had already entered. As others have observed: "ELIHPA's prepayment restrictions were effectively a partial repudiation by Congress of its contractual obligation to perform or, in other words, to allow plaintiffs to prepay their mortgages...." *Adams v. United States*, 42 Fed. Cl. 463, 472 (1998) (quotation omitted). In the context of federal programs, it appears relatively few loans were affected, perhaps numbering less than 5,000. *See* H.R.Rep. No. 122(I), 100TH Cong., 1st Sess.1987, 1987 U.S.C.C.A.N. 3317. To prevent enforcement of these private contracts between the third party trustee and the borrowers would be to "give the Government-as-contractor powers that private contracting parties lack." *Yankee Atomic Elec.*, 112 F.3d at 1575 (Fed.Cir.1997). Such a result cannot be countenanced because the government in its private contracting capacity cannot exercise sovereign power "for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties." *Id.*

The Court of Federal Claims reached a similar result in *Conoco v. United States*, 35 Fed. Cl. 309 (1996), when it held that the Outer Banks Protection Act was not a sovereign act, despite the government's stated general intention behind the legislation of protecting the environment. The *Conoco* court stated that "[i]t is not true ... that all of the government's actions taken to protect the environment are sovereign acts." *Id.* at 337. The result and reasoning of *Conoco* were validated on review by the Supreme Court. *Mobil Oil Exploration, Prod. Southeast, Inc. v. United States*, 530 U.S. at 619, 120 S.Ct. 2423. The Court, without directly addressing the sovereign acts or unmistakability doctrines, stated:

> But if legislation passed by Congress and signed by the President is not a 'statement by the obligor,' it is difficult to imagine what would constitute such a statement. In this case, it was the United States who was the 'obligor' to the contract.

*Mobil Oil*, 530 U.S. at 619, 120 S.Ct. 2423. The Court then affirmed the result reached by the Court of Federal Claims in *Conoco*: the plaintiffs were entitled to equitable relief in the form of restitution from the government for its repudiation of its contract. *Id.* at 624, 120 S.Ct. 2423; *see also Alaska Pulp Corp. v. United States*, 48 Fed. Cl. 655, 659 (2001) ("The archetypical repudiation ... occurs when one party to a contract attempts to unilaterally alter the contract or to condition his performance on terms that were not part of the bargain.... The result is no different where the government as a party to the contract commits this same sin through subsequent legislation.") (internal citations omitted).

Kimberly's situation is analogous to that of the plaintiffs in *Mobil Oil:* Kimberly entered a contract with the government and performed its part without exception; the government, through targeted legislation, sought to bring about an indefinite delay in the performance of the contract by the trustee, which constituted a substantial breach of the contractual terms; and Kimberly now seeks equitable relief in the form of a declaration quieting title to the property. Because the unmistakability doctrine does not apply in this circumstance, it was error to grant the defendant's motion to dismiss. We therefore

remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**