**ATWOOD–LEISMAN, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 98–815C.**

United States Court of Federal Claims.

June 5, 2006.

 

C. Clayton Gill, Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise, ID, for plaintiffs.

Michael S. Dufault, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

In this housing contract case, plaintiffs and defendant have both moved for partial summary judgment respecting plaintiffs' breach of contract claim.[1] Plaintiffs entered into mortgage contracts with the Farmer's Home Administration ("FmHA"), a federal government agency, to provide low- and moderate-income rural housing.[2] These mortgage contracts, which were entered into between 1974 and 1981, contained a provision that allowed the property owners to prepay their loans at any time and convert their property to market rents.[3] The implementation of the contracts was affected by the subsequent enactment of the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100–242, Tit. II, 101 Stat. 1815, 1877–91 (Feb. 5, 1988) ("ELIHPA"), and the Housing and Community Develop-

1. Seventeen separate plaintiffs stated claims in the Second Amended Complaint ("Second Am. Compl.") filed October 14, 2004. Fifteen of the plaintiffs are limited partnerships, each of which owns one or more of the 24 properties at issue in the case. Second Am. Compl. ¶ 7(1)(15). The remaining two plaintiffs are corporations that serve alternatively as the general partner for the limited partnerships.

2. These contracts defined eligible tenants and the rents plaintiffs could charge, limited the owner's "return on investment" to a maximum of eight percent of its "initial investment," i.e., its original equity in the project not counting the loan, and governed the maintenance and financial operations of each project. See Franconia Assocs. v. United States, 61 Fed.Cl. 718, 722 (2004) ("Franconia IV"), on remand from the Federal Circuit, 47 Fed.Appx. 565 (Fed.Cir.2002), after

the reversal and remand in Franconia Assocs. v. United States, 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) ("Franconia II").

3. "This prepayment option served as a major inducement for recruiting property owners into the program." Franconia IV, 61 Fed.Cl. at 722–23. Both property owners and FmHA were to benefit from prepayment. With prepayment, property owners could convert their properties to market rents and increase their return on investment. And, "consistent with statutory and regulatory requirements, the original contracts in the program required owners to prepay their loans upon FmHA demand as soon as commercial financing or similar terms became available, so that the moneys derived through prepayment could be invested by the agency in other properties." Id. at 723 (citing 42 U.S.C. § 1472(b)(3) (1982); 7 C.F.R. § 1865.2 (1979)).

ment Act of 1992, Pub.L. No. 102–550, 106 Stat. 3672 (1992) ("HCDA"), which among other things restrained pre-payment of plaintiffs' FmHA loans. In 1997 and 1998, plaintiffs tendered payment in an attempt to prepay their mortgages under the terms of the contract, but the government refused to accept the tenders or to release its liens encumbering the properties. The property owners claim that the government's refusal to accept prepayment represented a breach of the contract terms. *See* Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment on Breach of Contract Claim ("Pls.' Mem.") at 3–14. Defendant responds that plaintiffs' prepayment rights were susceptible to regulation and imposition of conditions by the government, and that the government's refusal to accept prepayment did not represent a material breach of the contracts. *See* Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment and Cross–Motion for Partial Summary Judgment ("Def.'s Cross–Mot.") at 10–17.[4]

For the reasons set out below, plaintiffs' motion for partial summary judgment on their breach of contract claim is granted, and defendant's cross-motion is denied.

## BACKGROUND

### A. History and Development of the FmHA Loan Program[5]

Plaintiffs each entered into, or assumed the rights and obligations under, a loan agreement with mortgage loans issued by FmHA, an agency within the United Stated Department of Agriculture, pursuant to Sections 515 and 521 of the Housing Act of 1949, Pub.L. No. 81–171, 63 Stat. 413, as added by Pub.L. No. 87–723, § 4(b), 76 Stat. 670, 671–72 (1962), and Pub.L. No. 90–448, § 1001, 82 Stat. 476, 551 (1968) (codified, as amended, at 42 U.S.C. §§ 1485, 1490a).[6] Under Sections 515 and 521, FmHA makes direct loans to private entities to develop or construct rural housing designed to serve elderly and low- or middle-income individuals and families. In securing Section 515 loans, the borrower executes a loan agreement, a promissory note, and a mortgage or deed of trust.

By 1979, Congress found that many participants in the Section 515 program were prepaying their mortgages, potentially threatening the availability of affordable rural housing. *See* H.R.Rep. No. 96–154, at 43–44 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2359. In response, Congress passed the Housing and Community Development Amendments of 1979, Pub.L. No. 96–153, 93 Stat. 1101 (1979), and the Housing and Community Development Act of 1980, Pub.L. No. 96–399, 94 Stat. 1614 (1980). The 1979 statute prohibited FmHA from accepting prepayment of any loan made before or after the date of enactment unless the owner agreed to maintain the low-income use of the rental housing for a 15–year or 20–year peri-

---

4. Contracts for 24 separate properties are at issue in this case: Cedars (Gooding), Gooding, Idaho; Cedars (Shelley), Shelley, Idaho; Chaparral, Emmett, Idaho; Forest Village, Reedsport, Oregon; Grand Cascade, American Falls, Idaho; Goose Creek, Burley, Idaho; Hillside Terrace, Coquille, Oregon; Kimberly Townhouses, Twin Falls County, Idaho; Leisure Village I, Fruitland, Idaho; Leisure Village III, Caldwell, Idaho; Leisure Village IV, Payette, Idaho; Leisure Village V, Caldwell, Idaho; Leisure Village VI, Kuna, Idaho; Madison Park, Rexburg, Idaho; Mountain View, Lane County, Oregon; Norsemen Village, Junction City, Oregon; Poplar Grove, Burley, Idaho; Sandlewood Apartments, Caldwell, Idaho; Sawtooth, Burley, Idaho; Seacrest, Bandon, Oregon; Vittoria Square, Newberg, Oregon; Wagon Wheel, Rexburg, Idaho; Washington Park I, Twin Falls, Idaho; and Washington Park II, Twin Falls, Idaho.

5. For reasons of economy, the court limits its discussion of the development of the FmHA loan program and the statutory history to that which is necessary to decide the pending motions. For a more detailed history of the program, *see, e.g., Franconia IV*, 61 Fed.Cl. at 722–24; *Grass Valley Terrace v. United States*, 51 Fed.Cl. 436, 437–39 (2002).

6. Since 1994, the program has been entrusted to the Rural Housing Service, known between 1994 and 1996 as the Rural Housing and Community Development Service. That agency was created by the Secretary of Agriculture under authority provided by the Department of Agriculture Reorganization Act of 1994, Pub.L. No. 103–354, Tit. II, § 233, 108 Stat. 3178, 3219–20, *as amended by the* Federal Agriculture Improvement and Reform Act of 1996, Pub.L. No. 104–127, Tit. VII, §§ 747(b)(3), 753(b)(2), 110 Stat. 888, 1128, 1131; *see also* 7 C.F.R. § 2003.18 (2003) (describing the functional organization of the Rural Housing Service). References to FmHA should be understood to include these successor agencies.

od from the date of the loan. Pub.L. No. 96–153, § 503, 93 Stat. at 1134–1135. That requirement could be avoided if FmHA determined that there was no longer a need for the low-cost housing. *Id.*, 93 Stat. at 1135. The 1980 Act provided that the prepayment restrictions would apply only to loans entered after December 21, 1979. Pub.L. No. 96–399, § 514, 94 Stat. at 1671–1672.[7]

In 1987, Congress passed ELIHPA, which amended the Housing Act of 1949 to restrict the prepayment of Section 515 mortgages that were entered into before December 21, 1979. ELIHPA required that before FmHA could accept an offer to prepay a mortgage entered before December 21, 1979, FmHA had to "make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing" for at least an additional 20 years. Pub.L. No. 100–242, § 241, 101 Stat. at 1886 (codified, as amended, at 42 U.S.C. § 1472(c)(4)(A)). ELIHPA further provided that FmHA could offer incentives to persuade an owner to keep its property in the program. 42 U.S.C. § 1472(c)(4)(B). These incentives included an increase in the rate of return on investment, reduction of the interest rate on the loan, and an additional loan to the borrower. *Id.* Under ELIHPA, if FmHA determined after a "reasonable period" that an incentive agreement could not be reached with a borrower who sought to prepay, the Secretary "shall" require the owner to offer to sell the housing to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." 42 U.S.C. § 1472(c)(5)(A)(I). If an offer to buy were not made by a nonprofit organization or agency within 180 days, FmHA could accept the borrower's offer to prepay or request refinancing. *Id.* § 1472(c)(5)(A)(ii). The requirement for an offer-for-sale to a non-profit buyer did not apply if FmHA determined that housing opportunities for minorities

"w[ould] not be materially affected" by prepayment and either: (I) the tenants would not be displaced by prepayment or (ii) there was an "adequate supply" of "affordable" housing in the market area and "sufficient actions ha[d] been taken to ensure" that such housing "will be made available" to displaced tenants. *Id.* § 1472(c)(5)(G)(ii). FmHA promulgated regulations to implement ELIHPA on April 22, 1988, and the regulations became effective on May 23, 1988. *See* Rural Rental Housing Displacement Prevention, 53 Fed. Reg. 13,245 (Apr. 22, 1988) (codified at 7 C.F.R. pts. 1944 and 1965).

In 1992, Congress passed the HCDA. That legislation extended ELIHPA's restrictions to loans that were made from December 21, 1979, through December 15, 1989. 42 U.S.C. § 1472(c). Thus, beginning in 1992, loans made after December 21, 1979, but before December 15, 1989, were subject to the same provisions of ELIHPA that applied to older complexes. In 1993, FmHA promulgated RD Instruction 1965–E, *see* Pls.' App. 3 at 700–800, describing the requirements of ELIHPA, HCDA, and the implementing regulations, and including detailed instructions regarding the procedures to be followed when processing a prepayment request.

### B. The Loan Agreements and Plaintiffs' Tenders of Prepayments

Each plaintiff in this case entered into a loan agreement under Section 515 with FmHA. *See, e.g.,* Pls.' App. 1 at 9–17 (Loan Agreement for Leisure Village V). The loan agreements included provisions designed to ensure that the projects were affordable for low income tenants, including restrictions limiting the owner's return on investment, specifying tenant eligibility, constraining rents, and imposing certain maintenance and financial obligations on each project. *See, e.g., id.* Each loan agreement also specified the length of the loan, which was generally 40 or 50 years. *See, e.g., id.* at 9.

---

7. Loans for four of the properties at issue in this case, Hillside Terrace, Vittoria Square, Kimberly Townhouses, and Leisure Village VI, were issued subsequent to December 21, 1979; each of the other loans were issued prior to that date. *See* Plaintiffs' Summary Judgment Motion Appendix ("Pls.' App.") 4 at 855–57 (chart). Plaintiffs ac-

knowledge the requirement that the four properties subject to the later loans were to remain available as low-income housing for 20 years from the date of the loan, but aver that these restrictions did not affect plaintiffs' ability to prepay the loans for these properties. Hr'g Tr. 8:24 to 10:11 (May 8, 2006).

The promissory notes executed by plaintiffs required payment of the principal on each mortgage in scheduled installments, plus interest. *See* Pls.' App. 1 at 18–20 (Promissory Note for Leisure Village V). The promissory notes contained the following prepayment provision: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." *See, e.g., id.* at 19. The notes for each of the properties at issue in this case contained this clause. *See id.* at 19, 42, 56, 76, 90, 112, 133, 151, 176, 193, 211, 232, 242, 260, 276, 291, 305, 328, 343, 359, 379, 398, 419, 434 (Promissory Notes).

In addition to the prepayment provision contained in the promissory notes, the deeds of trust contained a clause stating that within 60 days of prepayment, the deed of trust would terminate and a deed of reconveyance would be issued:

> Upon full and final payment of all indebtedness hereby secured and the performance and discharge of each and every condition, agreement and obligation, contingent or otherwise, contained herein or secured hereby, the Government shall request trustee to execute and deliver to Borrower ... a deed of reconveyance of the property within 60 days after written demand by Borrower, and Borrower hereby waives the benefits of all laws requiring earlier execution or delivery of such deed of reconveyance.

Pls.' App. 1 at 24, 38, 64, 216, 237, 248, 281, 296, 311, 364, 384, 424, 439 (Deeds of Trust).[8] Finally, the deeds of trust contained a clause stating that "[the loan] instrument shall be subject to the *present regulations* of the [FmHA], and to its future regulations *not inconsistent with the express provision hereof.*" Pls.' App. 1 at 24 (Deed of Trust for Leisure Village V, Clause (24)) (emphasis added).

Plaintiffs attempted to prepay the loans for the properties at issue in 1997 and 1998. *See* Pls.' App. 4 at 855–57 (Summary Table of prepayment dates). Plaintiffs submitted a letter for each property to FmHA announcing plaintiffs' intent to prepay the loan for that property; accompanying each letter was a check in the amount of the outstanding loan balance for that property. *See* Pls.' App. 2 at 456–535. The government rejected each of these prepayment tenders, stating that plaintiffs had failed to follow the prepayment procedures required by FmHA Instruction 1965–E. *See, e.g., id.* at 458 (Letter from M. Stewart Brent, Rural Development Manager, USDA to John Foster, DBSI Housing (Oct. 2, 1998)).

Plaintiffs filed a complaint in this court on October 26, 1998. The case was stayed or effectively stayed for a substantial time, pending a decision in the *Franconia* case first by the Federal Circuit and then by the Supreme Court.[9] Thereafter, following completion of discovery, the instant motions were filed and briefed and a hearing was held on May 8, 2006.

One plaintiff in this case, Kimberly Associates, also filed a claim in the District Court for the District of Idaho, requesting that the district court require the government to accept prepayment from the borrower and declare that the borrower was entitled to quiet title to the property. *See Kimberly Assocs. v. United States,* 261 F.3d 864 (9th Cir.2001). In the district court, the parties stipulated to final disposition by a magistrate judge, and the assigned magistrate judge concluded that Kimberly Associates was barred from any remedy under its contract with the government because of the unmistakability doctrine, *id.* at 867, which doctrine "allows 'the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise.'" *Id.* at 869 (quoting *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578 (Fed.Cir. 1997)). The Court of Appeals for the Ninth Circuit reversed, observing that "when the government is acting as a private contracting party, then the doctrine does not apply, and

---

8. Plaintiffs have submitted deeds of trust for 13 of the 24 properties at issue in this case.

9. *Franconia Assocs. v. United States,* 43 Fed.Cl. 702 (1999) *("Franconia I"), recons. denied,* 44 Fed.Cl. 315 (1999), *aff'd,* 240 F.3d 1358 (Fed.Cir. 2001) *("Franconia II"), rev'd and remanded,* 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002), *remanded,* 47 Fed.Appx. 565 (2002), *on remand,* 61 Fed.Cl. 718 (2004).

the government's rights and duties are governed by law applicable to private parties unaltered by the government's sovereign status." *Id.* (citing *United States v. Winstar Corp.,* 518 U.S. 839, 895, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Mobil Oil Exploration & Producing Se., Inc. v. United States,* 530 U.S. 604, 619, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000)). The Ninth Circuit determined that when the government enacted ELIHPA, the government was not acting in a "public and general" capacity. *Kimberly,* 261 F.3d at 870. Rather, the court concluded that "[t]he provisions of the 1992 amendments to ELIHPA applicable to Kimberly's situation constituted a narrow, targeted piece of legislation aimed at relieving the government from onerous provisions contained in a finite number of specific contracts it had already entered." *Id.* As a result, the Ninth Circuit held that the unmistakability doctrine did not apply. *Id.*[10]

## STANDARD FOR DECISION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202

**10.** Other Idaho plaintiffs in this case filed suit in the United States District Court for the District of Idaho after the government refused to accept their prepayment tender for certain of the properties at issue here. *See Atwood–Leisman, et al. v. United States,* Civ. No. 98–0416–S–BLW (D.Idaho 1998). Oregon plaintiffs filed suit in the District Court for the District of Oregon. *See DBSI–TRI IV Limited Partnership, et al. v. United States,* No. CV 98–1325–BR (D.Or.1998). Plaintiffs in both cases sought judgment quieting title on the grounds that they had an unconditional right to prepay and that they had tendered full payment. Following *Kimberly,* the District Court for the District of Idaho determined that the plaintiffs had the right to prepay their loans and that this prepayment right was unaffected by the passage of ELIHPA. Pls.' App. 3 at 838–49 *(Atwood–Leisman,* Civ. No. 98–0416–S–BLW (D.Idaho, Nov. 15, 2002) (slip op. at 8–11)). The court ordered the parties to confer to agree on a payoff figure for each property, which the plaintiffs were then to pay to the government. The court stated that upon notification of such payment, it would issue quiet title orders. *Id.* at 848 (slip op. at 11).

(1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505. A fact is "material" if it would affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505. In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Where cross-motions for summary judgment have been filed, a court must evaluate each motion on its own merits and resolve any reasonable inferences against the party whose motion is being considered. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987). Both motions must be denied if genuine disputes exist over material facts. *Id.*

## DISCUSSION

### A. Breach of Contract

■ Plaintiffs contend that they have put forward facts sufficient to show a breach of contract by the government. A fundamental tenet of contract law is that "[w]hen performance of a duty under a contract is due any non-performance is a breach." *Restatement*

The parties have indicated that the litigation in the district courts in Idaho and Oregon has yet to be finally resolved. Subsequent to the opinion issued by the district court in *Atwood–Leisman,* plaintiff DBSI and the government negotiated an Agreement in Principle setting forth a procedure allowing plaintiffs to sell their properties to non-profit entities. *See* Second Am. Compl. ¶¶ 46–47 and Ex. H (Agreement in Principle between the government and DBSI (Feb. 28, 2003)). Plaintiffs contend that plaintiff DBSI and the government agreed to current values for several of the properties pursuant to the Agreement in Principle, and that non-profit entities were identified that would purchase these properties. *Id.* ¶¶ 48–49. Plaintiffs further contend that before the sales were completed "the government refused to finance the sales as it was obligated to do pursuant to the 'Agreement in Principle.'" *Id.* ¶ 50. Plaintiffs have alleged a breach of the Agreement in Principle as a further claim in their Second Amended Complaint and seek money damages as a remedy for that breach. *Id.* ¶¶ 43–51.

*(Second) of Contracts* § 235(2) (1981). To demonstrate that the government breached the loan contracts, plaintiffs must show (1) that the government had a duty under the loan contracts *(i.e.,* to accept prepayment when tendered), (2) that circumstances existed such that performance on behalf of the government was due *(i.e.,* that plaintiffs tendered prepayment), and (3) that the government failed to perform its contractual duty when performance was due *(i.e.,* that the government refused to accept prepayment). The question of whether the government had a duty is a legal question; the only facts necessary to decide plaintiffs' motion for summary judgment and defendant's cross-motion are whether plaintiffs tendered payment and whether the government rejected the tendered prepayment. Plaintiffs have put forward undisputed facts establishing both of these elements. Plaintiffs have established that they tendered payment for the amounts due on their loans, and that the government refused to accept payment. *See* Pls.' App. 2 at 442–646 and 4 at 855–57. The government does not contest that plaintiffs attempted to prepay their loans and that the government did not accept plaintiffs' tender. Hr'g Tr. 33:15 to 36:11. Rather, the government's cross-motion avers that either (1) plaintiffs did not have an unfettered right to prepay and that prepayment was susceptible to further regulation, or (2) even if the imposition of further regulation was a technical breach of contract, it was of such negligible effect that the breach was not material. Def.'s Cross–Mot. at 10–17; Hr'g Tr. 34:21–22 ("[I]t comes down to materiality."). The first argument is a legal one; the second posits that the effect of the breach was so minor or *de minimis* that plaintiff suffered no harm and no damages are due. In the circumstances, the court concludes that there is no genuine issue as to any material fact regarding the government's liability for breach and therefore that it is appropriate for the court to determine whether plaintiffs are entitled to summary judgment on liability as a matter of law. *See* RCFC 56(c); *Liberty Lobby,* 477 U.S. at 247–49, 106 S.Ct. 2505.

Whether plaintiffs are entitled to summary judgment that the government breached their loan contracts depends upon whether plaintiffs had an unfettered contractual right to prepay. The loan contracts stated unequivocally that plaintiffs had the right to prepay the contract "at any time". *See supra,* at 145–46 (quoting from the promissory notes). Correlatively, the government had a concomitant duty to accept the prepayment at the time of tender. The loan contracts specified that a deed of reconveyance would be conveyed to a borrower within 60 days of payment of all indebtedness on the loan and satisfaction of any other conditions specified in the contract. *See supra,* at 145–46 (quoting from the deeds of trust).

The government's argument that plaintiffs' right to prepay was not absolute but rather was subject to regulation by the government rests upon contentions divorced from the contractual provisions. The government contends that the loan contracts did not foreclose future regulatory change: "Neither the prepayment clause in the promissory notes, nor any other contract provision identified by plaintiffs, precludes regulation of the prepayment process in order to prevent the purpose of the section 515 program from being undermined." Def.'s Cross–Mot. at 12. The government offers an extreme illustration in support of this point, stating that a truly unfettered prepayment right would have allowed borrowers to prepay their loans before renting to a single low-income tenant. *Id.* at 11. To avoid this hypothetical result, the government argues, one must *assume* some limitations on borrowers' prepayment right. *Id.* In a similar vein, the government suggests that it had to develop procedures to facilitate and regulate the prepayment process. *See* Hr'g Tr. 30:4 to 31:11. Once one accepts that some regulation of the prepayment right is necessary, the argument goes, then the government may impose new restrictions without repudiating the contractual terms so long as the restrictions do not totally cut off the prepayment right. *See* Hr'g Tr. 31:18–21, 32:21 to 33:6. The government implies that the restrictions imposed by ELIHPA, HCDA, and the implementing regulations were the kind of regulation that a holder of loans issued under Section 515 might expect. As the government would have it, the statutes and regulations did ·not repre-

sent a repudiation of the contract terms, and the government's refusal to accept the pre-payment tender was therefore not a breach of the loan contracts. Def.'s Cross–Mot. at 14–17; Hr'g Tr. 32:21 to 33:4.

The government's overlay on the contracts directly conflicts with the plain meaning of provisions in the contracts. "The interpretation of a contract 'begins with the language of the written agreement.'" *Southern Cal. Edison v. United States,* 58 Fed.Cl. 313, 321 (2003) (quoting *Coast Fed. Bank, FSB v. United States,* 323 F.3d 1035, 1038 (Fed.Cir. 2003)). "'Where ... the provisions of the Agreement are phrased in clear and unam-biguous language, they must be given their plain and ordinary meaning, and [the court] may not resort to extrinsic evidence to inter-pret them.'" *Id.* Here, the promissory notes plainly stated that "[p]repayments of sched-uled installments, or any portion thereof, may be made at any time at the option of Borrower." *Supra,* at 146. Furthermore, the deeds of trust expressly disavowed future regulatory changes, providing that the loan contracts would be subject only to those "fu-ture regulations not inconsistent with the express provision hereof." *Supra,* at 146. To superimpose the restrictions of ELIHPA and HCDA on the loan contracts at issue would contravene these express provisions of the loan contracts. Moreover, to allow the government to alter the terms of its con-tracts on such a basis would render the contracts illusory. *See Franconia IV,* 61 Fed. Cl. at 730 (citing *Franconia III,* 536 U.S. at 142, 122 S.Ct. 1993).[11] The government may abrogate its contracts, but if it does, it must bear the consequences of such actions. *See, e.g., Mobil Oil Exploration,* 530 U.S. at 624, 120 S.Ct. 2423 (holding that passage of a statute that made government performance impossible did not relieve the government of its contractual responsibilities).

The government's position in this case is essentially an attempt to relitigate issues ad-dressed in *Franconia.* During the hearing held on May 8, 2006, counsel for the govern-ment maintained that the issue of whether

borrowers enjoyed an unfettered right to prepay their loans under the contract was not decided but rather was merely assumed by the Supreme Court in *Franconia II. See* Hr'g Tr. 37:4–17. In that opinion, the Su-preme Court indeed did state that it "as-sume[s] that petitioners obtained precisely the promise they allege—a promise that per-mits them an unfettered right to prepay their mortgages any time over the life of the loans, thereby gaining release from federal restric-tions on the use of their property." *Franco-nia III,* 536 U.S. at 141, 122 S.Ct. 1993. This assumption was the basis for the Supreme Court's ruling on the statute-of-limitations issue that was before it in *Franconia III,* and the assumption was the predicate for the Supreme Court's remand to the Federal Cir-cuit and the Circuit's remand to this court, which ultimately tried the issue to a judg-ment on liability and damages as reflected in *Franconia IV.* On remand, after conducting an exhaustive analysis of the legislative histo-ry surrounding the rural housing program, Judge Allegra of this court concluded that the "[l]egislative history ... confirms what the plain language of the notes manifests—that the FmHA was required to accept un-conditionally any prepayments made by property owners." *Franconia IV,* 61 Fed.Cl. at 731–32 & n. 17. This court concludes that the government has put forward no argu-ment in the present case which would contro-vert Judge Allegra's analysis in *Franconia IV.*

Ultimately, the government is remitted to a makeweight argument that even if the im-position of restrictions on prepayment might have represented a technical breach, it is but a harmless one of no consequence. At the hearing on the pending motions, counsel for the government likened the impositions of the restrictions on prepayment to the gov-ernment's changing the color of the forms that a borrower must complete and submit when requesting prepayment. Hr'g Tr. 54:16 to 55:14. This exercise in *reductio ad absurdum* has no persuasive power whatso-ever. Whether or not a change in the color of the forms might represent a breach, that

---

11. The government explicitly averred that it was not raising the so-called unmistakability doctrine as a defense, acknowledging that the unmistaka-

bility doctrine would not apply in this case. *See* Def.'s Cross–Mot. at 17 n. 6; *Centex Corp. v. United States,* 395 F.3d 1283 (Fed.Cir.2005).

is not what happened in this case. The government severely restricted the borrowers' prepayment rights to the point where they could no longer be exercised in the circumstances of these borrowers. Indeed, that was the congressional purpose behind the enactment of ELIHPA and HCDA—to prevent borrowers from prepaying and to keep properties in the program. *See supra,* at 144–45. In due course, the restrictions ripened into the government's refusal to accept prepayment in this case. *See also Franconia IV,* 61 Fed.Cl. at 733 (citing *Franconia II,* 536 U.S. at 142–43, 122 S.Ct. 1993). The government's actions have deprived plaintiffs of benefits for which they bargained and which they reasonably expected. *See Restatement (Second) of Contracts* § 241(a).[12]

In a related vein, the government asserts in its briefs that its rejection of plaintiffs' prepayment tender constituted "efforts to merely persuade the borrower to voluntarily keep the property in question in the section 515 program ... by offering the borrower economic incentives...." Def.'s Cross–Mot. at 12 (citing *General Dynamics Corp. v. United States,* 214 Ct.Cl. 607, 558 F.2d 985, 990 (1977)) ("Those who enter a contract may take steps at any time after its execution to modify it."). The government's actions were not, however, a mere invitation to modify the terms of the contracts. Plaintiffs were not given the option to accept or reject the restrictions imposed by ELIHPA and HCDA. *See Franconia IV,* 61 Fed.Cl. at 733 n. 21. The unilateral rejection of prepayment by the government represented a material curtailment of plaintiffs' contractual rights.

The court concludes that the government's actions constituted a breach of its contracts with plaintiffs and that plaintiffs are entitled to judgment as a matter of law on the issue of liability.

## B. Collateral Estoppel

Plaintiffs contend that the government's defenses to liability are barred by collateral estoppel as a result of the decision by the Ninth Circuit in *Kimberly,* 261 F.3d 864. *See* Pl.'s Mem. at 14–17. Only Kimberly Associates was a plaintiff in that case, but each of the other plaintiffs seeks also to rely on *Kimberly* as a basis for collaterally estopping the government to engender a partial summary judgment on liability.

Collateral estoppel "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *See Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (citing *Restatement (Second) of Judgments* § 27 (1982)). Also called "issue preclusion," collateral estoppel "bars parties to a prior lawsuit from relitigating any issues that were actually and necessarily determined by a court of competent jurisdiction in the prior suit." *Arkla, Inc. v. United States,* 37 F.3d 621, 623 (Fed.Cir.1994) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)). "Collateral estoppel is appropriate only if: (1) the issue to be decided is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the parties had a full and fair opportunity to litigate the issue in the first action." *Arkla,* 37 F.3d at 624 (citing *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir. 1983)).

In applying the doctrine of collateral estoppel, and especially in applying the doctrine against the government, the mutuality of the parties in the prior and current litigated matters is an important consideration. *Compare United States v. Mendoza,* 464 U.S.

---

12. Restatement (Second) of Contracts § 241 states, in pertinent part:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

...

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

154, 158, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (nonmutual offensive collateral estoppel did not operate against the federal government), *with United States v. Stauffer Chem. Co.*, 464 U.S. 165, 169, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984) (mutual defensive collateral estoppel applied against federal government). In this instance, plaintiffs seek to apply the doctrine offensively against the government and, as noted, only one of the plaintiffs, Kimberly Associates, was a participant in the prior litigation. Thus, except for Kimberly Associates, mutuality is lacking, and the other plaintiffs' attempted invocation of the doctrine is unavailing. *See Mendoza*, 464 U.S. at 162–63, 104 S.Ct. 568; *Bingaman v. Department of the Treasury*, 127 F.3d 1431, 1439 (Fed.Cir.1997).

As to Kimberly Associates, application of the doctrine rests within a grey area of the law because, although mutuality is present, Kimberly Associates seeks to invoke the doctrine to advance its claim rather than to defend against the government's claims. Consequently, Kimberly Associates' circumstances falls squarely between those addressed by the Supreme Court in the *Mendoza* and *Stauffer Chemical* decisions.[13] It is unnecessary to resolve the question of applicability of the doctrine posed by Kimberly Associates, however, because summary judgment on liability is appropriate for Kimberly Associates on traditional merits-based grounds just as it is for the other plaintiffs. Accordingly, as a prudential matter, the court does not reach the collateral estoppel contention raised by Kimberly Associates.

### CONCLUSION

The government's refusal to accept plaintiffs' tender of prepayment constituted breaches of FmHA contracts, and plaintiffs are entitled to judgment as a matter of law on the issue of liability. Plaintiffs' motion for partial summary judgment is therefore GRANTED. Defendant's cross-motion for summary judgement is correspondingly DENIED.

It is so ORDERED.

---

**13.** Notwithstanding this uncertainty, there is substantial merit to Kimberly Associates' arguments favoring application of collateral estoppel. Apart from the Ninth Circuit's decision in *Kimberly*, the decision of the district court itself arguably would have collateral estoppel effects on the government's potential defenses to the claims raised by Kimberly Associates. Importantly in this regard, the district court based its decision solely upon the finding that Kimberly Associates had an unfettered contractual right to prepay that had been breached by the government, *i.e.*, there were no alternative grounds for the district court's decision. *See American Fed. Bank, FSB*

*v. United States*, 58 Fed.Cl. 429, 435 (2003) (citing *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168–73 (5th Cir.1981); *Restatement (Second) of Judgments* § 27, cmts. i, o (1982)).

Kimberly Associates' arguments in favor of applying collateral estoppel are also supported by the Supreme Court's decision in *United States v. Moser*, 266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262 (1924), in which a retired naval officer had obtained a judgment from the Court of Claims for retirement pay and that judgment was applied to defeat the government's effort to relitigate his eligibility for retirement pay in a subsequent action.